**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

United States of America

v.

Robert P. Burke, Yongchul "Charlie" Kim,
and Meghan Messenger,

　　　　　　Defendants.

**Case No. 1:24-cr-00265-TNM**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS YONGCHUL "CHARLIE" KIM'S AND MEGHAN MESSENGER'S**
**JOINT MOTION TO SEVER TRIAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement ...................................................................................................... 1

Background ......................................................................................................................... 2

    A.    Company A's Early Work With The Navy And Subsequent Business
           Proposal ...................................................................................................... 2

    B.    Company A Follows Up On Its Proposal And First Learns That Burke
           Must Assume A Limited Role Moving Forward ......................................... 4

    C.    Movants Follow Up On The $100 Million Navy Contract ....................... 5

    D.    Movants Meet With Navy Personnel About The $100 Million Contract ............... 6

    E.    July 2021: Movants Meet Again With Senior Navy Personnel About The
           Contract ...................................................................................................... 8

    F.    Company A And Burke Continue Employment Discussions ................................ 10

Legal Standard ................................................................................................................. 11

Argument .......................................................................................................................... 12

I.      EVIDENCE CONCERNING COUNTS THREE, FOUR, AND FIVE WILL
       PREJUDICE MOVANTS ................................................................................. 13

    A.    Burke Is Significantly More Culpable Than Movants And The Jury Will
           Be Invited To Use Evidence Of His Crimes Against Movants ........................... 14

    B.    Jury Instructions Cannot Cure Prejudice To Movants ........................................ 17

II.     CONFLICT BETWEEN BURKE AND MOVANTS WILL PREJUDICE
       MOVANTS ...................................................................................................... 18

Conclusion ....................................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Blunt v. United States*,
    404 F.2d 1283 (D.C. Cir. 1968) ............................................................................... 12

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974) ............................................................................................... 17

*O'Rear v. Fruehauf Corp.*,
    554 F.2d 1304 (5th Cir. 1977) ............................................................................... 18

*Schaffer v. United States*,
    362 U.S. 511 (1960) ............................................................................................... 12

*United States v. Berkowitz*,
    662 F.2d 1127 (5th Cir. 1981) ............................................................................... 19

*United States v. Edelin*,
    118 F. Supp. 2d 36 (D.D.C. 2000) ................................................................... 12, 17

*United States v. Gooch*,
    665 F.3d 1318 (D.C. Cir. 2012) ............................................................................. 12

*United States v. Gray*,
    173 F. Supp. 2d 1 (D.D.C. 2001) ..................................................................... 12, 17

*United States v. Gray*,
    292 F. Supp. 2d 71 (D.D.C. 2003) ................................................................... 17, 20

*United States v. Halliman*,
    923 F.2d 873 (D.C. Cir. 1991) ............................................................................... 14

*United States v. Jett*,
    908 F.3d 252 (7th Cir. 2018) ................................................................................. 17

*United States v. Lewis*,
    Case No. 1:19-cr-307-RCL, 2022 WL 1090612 (D.D.C. Apr. 11, 2022) .......... 14, 19

*United States v. Mardian*,
    546 F.2d 973 (D.C. Cir. 1976) ............................................................................... 17

*United States v. McCaughey*,
    605 F. Supp. 3d 84 (D.D.C. 2022) ......................................................................... 12

ii

*United States v. Monge*,
  2011 WL 13176072 (D. Ariz. July 14, 2011) ................................................................ 21

*United States v. Slade*,
  627 F.2d 293 (D.C. Cir. 1980) ........................................................................... 18, 19

*United States v. Slatten*,
  865 F.3d 767 (D.C. Cir. 2017) ................................................................................ 12

*United States v. Tarantino*,
  846 F.2d 1384 (D.C. Cir. 1988) ......................................................................... 17, 20

*United States v. Troiano*,
  426 F. Supp. 2d 1129 (D. Haw. 2006) ..................................................................... 20

*United States v. Wright*,
  783 F.2d 1091 (D.C. Cir. 1986) .............................................................................. 19

*Zafiro v. United States*,
  506 U.S. 534 (1993) ........................................................................... 12, 14, 17, 21

## **Rules**

Federal Rule of Criminal Procedure 14(a) .............................................................. 11, 12, 14

## **Statutes**

18 U.S.C. § 201(b)(1) ............................................................................................. 1

18 U.S.C. § 201(b)(2) ............................................................................................. 1

18 U.S.C. § 208(a) ................................................................................................. 1

18 U.S.C. § 371 ..................................................................................................... 1

18 U.S.C. § 1001(a)(1) ........................................................................................... 1

**Preliminary Statement**

Defendants Yongchul "Charlie" Kim and Meghan Messenger (together, "Movants") respectfully submit this memorandum in support of their joint motion for severance. For the reasons detailed below, Movants jointly request a separate trial from co-Defendant Robert Burke.

On May 31, 2024, this Court unsealed a five-count indictment. Count One charges all three Defendants with conspiracy to commit bribery, in violation of 18 U.S.C. § 371. Count Two charges only Movants with bribery, in violation of 18 U.S.C. § 201(b)(1). Counts Three, Four, and Five charge only Burke with bribery, in violation of 18 U.S.C. § 201(b)(2), acts affecting a personal financial interest, in violation of 18 U.S.C. § 208(a), and concealment of material facts, in violation of 18 U.S.C. § 1001(a)(1), respectively. Severance is warranted here because Movants would be unfairly prejudiced at a joint trial of all three Defendants by evidence offered against Burke in support of counts in which Movants are not charged, and because Movants' defense and Burke's anticipated defense are mutually exclusive of each other. In sum, and consistent with the government's anticipated evidence in support of Counts Three, Four, and Five against Burke, Movants intend to offer evidence at trial that, in an effort to influence contracts between Company A and the Navy, Burke may have deliberately and repeatedly misled Movants to believe that he could lawfully engage in employment discussions with Movants while he was still a Navy senior officer.

## Background

### A.     Company A's Early Work With The Navy And Subsequent Business Proposal

Movants are co-CEOs of Company A, a privately-held company that operates, among other things, an employee benefits platform and offers executive leadership training.[1]  Ex. A (November 1, 2019 Executive Summary) at 4; Indictment ¶¶ 2, 3.  In early 2018, Company A entered into a $2 million contract with the Navy (the "First Navy Contract").  In late 2018, Company A entered into a subsequent $10 million contract with the Navy to train part of the Navy workforce (the "Second Navy Contract").  Indictment ¶ 11; Ex. B (████████████████████████ ████████████) at 2.  Burke, who at the time was a four-star U.S. Navy Admiral, was Company A's main Navy contact.  Indictment ¶¶ 1, 28-34.

Approximately one year into the contract, Kim reached out to Burke by email to explore other ways Company A could help the Navy train its staff.  Ex. C (September 2019 email exchange between R. Burke, Movants, and B. Mietus) at 1.  Kim also offered to connect with Burke to discuss in greater detail how Company A would implement the proposed training strategies.  *Id.* at 1, 4.  This was Company A's second attempt at a larger "all Navy" engagement which had previously been supported by former Navy CNO Bill Moran.

Burke responded to Kim's email the next day.  *Id.* at 1.  Burke explained that he had recently met with the Navy's newly-appointed Chief of Naval Operations ("CNO")—the highest-ranking Naval officer—and that, consistent with Kim's suggestion, the "best option" for Company A to secure business with the Navy was for Movants to come to Washington, D.C. and meet with the CNO in person.  *Id.*  Burke offered to "lock in" the CNO for at least a few hours for this

---

[1]   To provide the Court a more complete picture of the relevant events, this memorandum supplements the Indictment using relevant documents collected from Company A's records.

discussion.  *Id.*  By the end of September 2019, the CNO had scheduled a meeting with Movants.
Ex. D (September 2019 email exchange between D. Platz, Movants, and others) at 1.

Prior to the meeting, Kim informed Company A's investors that, "[w]ith the help of" Burke,
Company A had secured a meeting with the CNO.  Ex. II (October 2019 email exchange between
Movants and others) at 1.  Kim told the investors that he had "prepar[ed] a proposal" to upgrade
Company A's partnership with the Navy from a "limited pilot/test to a full Navy program," *id.*,
and that Company A's goal was "to secure a minimum $50MM annual contract."  *Id.*  He explained
that Company A was also preparing a larger $100 million proposal, noting that Burke had told
Movants he "believe[d] [that the CNO] w[ould] be a fan."  *Id.*  Despite Burke's optimism, Kim
was unsure if the CNO would sign off on the larger, $100 million proposal.  *Id.*

A scheduling issue arose, and Movants were ultimately unable to meet with the CNO.  Ex.
E (October 2019 email exchange between R. Burke, Movants, and others) at 3.  Instead, Movants
met with Burke in late October 2019, and discussed broader, "all Navy" services Company A could
provide.  *Id.* at 1,3; Ex. F (October 2019 email exchange between R. Burke and Movants) at 1.  In
a follow-up email to Burke, Kim specifically discussed Company A's $100 million proposal,
emphasizing Company A's unrivaled ability to "develop[] people faster than anyone" which would
provide the Navy with a "new competitive advantage" and effectively "upgrade" the Navy.  Ex. F
at 1 (emphasis omitted).  Movants offered to draft an executive summary to aid Burke's discussions
about the proposal with the CNO.  *Id.*  Burke agreed that a summary would be useful and agreed
to speak with the CNO.  *Id.*; Ex. G (November 2019 email exchange between R. Burke and
Movants) at 1.  Burke later followed up that he had been unable to talk to the CNO about the
proposal, but he thought the summary that Movants provided was "excellent" and agreed to push
the project "aggressively."   Ex. H (November 2019 email exchange between R. Burke and

Movants) at 1; *see also* Ex. I (November 1, 2019 email from C. Kim to R. Burke and M. Messenger); *see generally* Ex. A.

A few days later, at a Navy offsite training facility, Burke notified Kim and Messenger in person that the CNO had approved Company A's proposal, explaining that he had received "the go ahead to move out on [Company A]," Ex. J (November 2019 email exchange between Movants and others) at 1,—a fact omitted entirely from the Indictment. *All* of these events—the First Navy Contract, the Second Navy Contract, Burke's early advocacy around the potential $100 million contract, and Burke's communication to Movants about the CNO's approval—occurred before *any* of the allegedly improper job discussions at the heart of the Indictment.

**B.    Company A Follows Up On Its Proposal And First Learns That Burke Must Assume A Limited Role Moving Forward**

The following day, Kim emailed Burke to express his excitement about the "CNO's backing" and Movants' desire to meet with Burke to walk through Company A's approach. Ex. K (November 2019 email exchange between R. Burke, Movants, and others) at 1. Without elaborating, Burke's aide subsequently notified a Company A staff member that "it [wa]s best that [Company A] and [Burke] not have contact at this time" due to Burke's role in securing approval for Company A's proposal. Ex. L (November 2019 email exchange between R. Burke, Movants, and others) at 1. Company A's staff member forwarded this message to Movants. *Id.* At no prior point had Movants, or anyone at Company A to Movants' knowledge, been told of such a restriction. Movants confirmed to Burke that they would "stand by until" they heard from him. *Id.*

The following week, Burke's office notified Movants that Burke had been replaced as their point of contact. ███████—a high-ranking Department of Defense ("DOD") official—would be Company A's point of contact regarding its "way-forward" with the Navy on the $100 million

proposal.  Ex. M (November 12, 2019 email from B. Mietus to D. Platz, Movants, and others) at

1.  While ███ was to be Company's A's direct contact, Burke's office told Movants that ███

and Burke would nevertheless meet the following week "to synchronize on the way forward."  *Id.*

     Kim contacted ███ two days later and, after their conversation, told her that he would

send her information to facilitate her discussion with Burke.  Ex N (November 2019 email

exchange between ███, C. Kim, and others) at 1.  Kim also told ███ that the Navy was

delinquent on Company A's "existing contract" (*i.e.*, the 2018 $10 million contract) and requested

███ help to secure payment.  *Id.* at 1-2.  Later that day, ███ told Kim to expect a "slow[] . . .

down momentarily," but assured him he could expect "a good investment for a long term gain."

*Id.* at 1.

### C.    Movants Follow Up On The $100 Million Navy Contract

     Months passed without Movants hearing from the Navy about the new contract.  Ex. O

(June 2020 email exchange between J. Nowell, Movants, and others) at 1.  In June 2020, Kim

contacted the Chief of Naval Personnel ("CNP"), seeking an update.  *Id.*  Kim also acknowledged

that Movants had been told not to speak with Burke while Company A was "in the 'contracting

actions phase.'"  *Id.*  The CNP replied that he understood Kim's concern but was unable to provide

an update, instead referring Kim "to the Contracting Office."  *Id.*

     After three more months passed without movement, and recalling that Burke had told

Movants the contract had been approved by the CNO in November 2019, Kim emailed Burke

directly.  Ex. P (September 2020 email exchange between R. Burke and Movants) at 1.  Kim

explained that Movants had not heard from the Contracting Office and wanted to know if Burke

had "any insights or guidance o[n] how best to proceed."  *Id.* at 2.  The same day, Burke told

Movants that he did not have any insights but would look into the contract and follow up "in a few

days."  *Id.* at 1.

**D.      Movants Meet With Navy Personnel About The $100 Million Contract**

Burke never followed up, Indictment ¶ 27, and five more months passed without an update.

In the meantime, ████████████████████████████████████████████████████

████ Ex. B at 2 ██████████████████████████████████  In early 2021, Kim asked Burke

for a meeting.  Indictment ¶ 28.  After Kim followed up, Burke agreed to set up a meeting.  *Id.* ¶

29.

Navy staff set up a meeting between Movants, Burke, and ████████, which occurred on April

8, 2021.  Ex. Q (April 2021 email exchange between D. Rolnick, Movants, and others) at 2.  The

next day, Kim sent Company A's investors and senior leadership updates summarizing the meeting.

Ex. R (April 9, 2021 email from C. Kim to others) at 1; Ex. S (██████████████████████████

████████████████████) at 1.  Neither the meeting itself nor Kim's summaries are included in the

Indictment, but in fact, all are crucial events in the chronology.

Kim explained to Company A's investors and senior leadership that Burke believed

Company A could assist the Navy and that he was interested in acting as an "ambassador/custodian"

for Company A.  Exs. R at 1; S at 1.  Kim initially thought that Burke intended to act as Company

A's "ambassador" after a "cooling off period," meaning after he retired from the Navy and his no-

contact period with the Navy had expired.  Exs. R at 1; S at 1.  Burke, however, informed Movants

that he wanted to be Company A's ambassador immediately.  Importantly, Burke told Movants

that this relationship was permissible under Navy conflict rules because Company A was not

considered "a defense contractor (as in selling weapons, plane parts, etc.)."  Ex. R at 1; *see* Ex. S

at 1 (██████████████████████████████████████████████████████████████████████████

██████████████████████).  This discussion, omitted from the Indictment, occurred in the

presence of ████████, *see* Ex. R at 1, ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

6

████████████████████████████████████████████████

████ ." Ex. T (██████████████████████████) at 80:17-22.

The full account of the April 8, 2021 meeting, as relayed by Kim to Company A's senior leadership (all of whom—aside from Movants—are outside the alleged conspiracy, and none of whom is alleged to have engaged in any wrongdoing), gives no indication that Movants believed the discussion was improper:

> Bob asks, can i be a custodian of NxJ...to which I say - you mean after you return from 4-star, then 2 years of cooling off period...to which he respond, no right now. He said unless you are a defense contractor (as in selling weapons, plane parts, etc.), I can be an ambassador/custodian...to which ███████ said she will get us the info on this/ cooling off period/ conflict rules…to which we were like - ummm…would be great.

Ex. R at 1; *see* Ex. S at 1. Movants had no reason to believe that Burke (a four-star Admiral) and ████ (a high-ranking DOD official) were unaware of—or misinformed them regarding—the Navy's rules and regulations. ████████████████████

████████████████████████████████████████ Ex. T at 80:21-22. Movants, accordingly, reasonably relied on Burke's representations.

After the meeting with Burke and ████, Kim continued to provide investors with updates concerning Company A's relationship with Burke and the Navy. In one such conversation with an investor, Kim identified Burke as Company A's "main contact" and "champion" since Company A started working with the Navy. Ex. U (April 9, 2021 email exchange between investor and Movants) at 1. Kim also told the investor that, during the April 8, 2021 meeting, Burke had asked "if he could be an ambassador for [Company A] as soon as possible (even while in the position) as he doesn't see conflicts as we aren't defense contractors (as in we sell diapers, no jet parts)." *Id.*

Burke and Movants spoke again later in April 2021 and in May 2021.  Ex. V (April 2021 email exchange between R. Burke and Movants) at 1; Indictment ¶ 31.  During their May 2021 conversation, and consistent with Burke's prior statements about acting as Company A's ambassador, Burke informed Movants that he was seeking funding for the proposed contract. Indictment ¶ 32.

**E.      July 2021: Movants Meet Again With Senior Navy Personnel About The Contract**

In July 2021, Burke and Movants met for lunch in Washington, D.C.  Ex. W (July 2021 email exchange between R. Burke, C. Kim, and others) at 1; Ex. X (July 2021 email exchange between C. Kim and others) at 1.  Burke was joined by a woman he described to Movants as a senior official in the Office of the Under Secretary of the Navy.  *See* Ex. X at 1.  While the Indictment acknowledges that the woman was "a civilian employee in the Navy," it also describes her as Burke's "companion."  Indictment ¶ 9.  Critically, this latter point—that the female Naval official at the lunch meeting was Burke's "companion"—was entirely unknown at the time to Movants.  Indeed, Movants had no reason to believe the senior Naval official was also Burke's "companion" because they knew that Burke was married to a different woman.

Kim emailed Company A personnel a recap of the lunch meeting the same day, explaining that Burke's command would be the first to receive Company A's services under the new contract. Ex. X at 1.  Those services would begin as soon as possible and, if successful, Burke indicated that he could persuade the CNO to approve a larger contract with Company A.  *Id*.

Kim also told Company A personnel that they had discussed at the lunch meeting Burke potentially joining Company A in the summer of the following year.  *Id.*  Kim explained that they discussed "salary" and "equity" and noted that, while Burke indicated that he wanted to resign from the Navy "next week," Movants preferred that he stay with the Navy as he would continue to help them navigate the contract process.  *Id*.  The senior Naval official who, unbeknownst to

Movants, was also Burke's "companion" actively participated in this discussion about the terms of Burke's potential future employment with Company A.

Several days later, █████████████████████████████████████ Ex. Y (████████████████████████████████████████) at 1. ███████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████ *Id.* ██████████████████████████████████████████████████████ ████████ *Id.* ████████████████████████████████████████ █████████████ *Id.* ██████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████ *Id.*

Notably, Movants provided to over 70 sophisticated Company A investors *detailed information* about their employment discussions with Burke while explaining to them that Burke was in a position to send a contract to Company A. These contemporaneous communications are wholly inconsistent with allegations that the Movants acted corruptly, as evidenced by the fact that the government does not allege that a single Company A investor is a co-conspirator or involved in any way in the alleged bribery scheme. Moreover, Movants had these purportedly corrupt discussions with Burke in the presence of senior DOD officials—███████████, present at the April 8, 2021 meeting, and the senior Naval official (who, unknown to Movants, was also Burke's "companion"), present at the July 21, 2021 lunch—who are not alleged to be co-conspirators or involved in the scheme at all. Movants will argue at trial that this and other evidence is compelling

9

proof that they lacked the requisite intent to commit the offenses they are charged with in the Indictment.

**F.      Company A And Burke Continue Employment Discussions**

Company A eventually obtained a $355,000 contract to train Navy personnel, which was performed in January 2022.  Indictment ¶¶ 38, 41-44.

In May 2022, Burke told Movants that he had received the Navy's approval to begin in earnest discussions about joining Company A after his retirement from the Navy.  Ex. Z (May 13, 2022 email from R. Burke to Movants and B. Burke) at 2.  To that end, Burke sent Movants: (1) a disqualification letter that he "was required to submit before talking to [Movants] on this, which says [that he] will not [be] involve[d] . . . with decisions for new or existing contracts with [Company A] while still in this job and having conversations with [Company A;]" and (2) an ethics advice letter, which reflected that he "was personally involved in two Navy contracting actions with" Company A.  *Id.*; *see* Ex. AA (May 9, 2022 Disqualification Statement) at 1; Ex. BB (May 13, 2022 Memorandum from Force Judge Advocate to R. Burke) at 2-4; *see generally* Ex. CC (April 29, 2022 Memorandum from Force Judge Advocate to R. Burke) at 1.  A week and a half later, in late May 2022, Company A extended Burke an official employment offer with a $500,000 base salary—more than the entire $355,000 contract Burke allegedly helped to secure.  *See* Ex. DD (May 24, 2022 letter from Company A to R. Burke) at 1.

By summer 2022 and prior to his joining Company A, Burke informed Movants that his involvement in the $355,000 contract was under scrutiny by federal investigators.  Burke subsequently asked Movants if they intended to rescind his employment offer.  They declined, explaining that they wanted Burke for his qualities as a leader.  *See* Ex. EE (September 2022 email exchange between Movants and R. Burke) ("[W]e hired you because you are a badass.").

Months before Burke's start date, Movants informed investors (more than 70 people, none of whom the government alleges is a co-conspirator) and Company A's employees (who are likewise not alleged to be co-conspirators) that Burke was under investigation regarding the contract.  Ex. FF (July 2022 email exchange between C. Kim, M. Messenger, and others) at 1.  Regardless, Movants assured their investors that Burke would be brought on, emphasizing his experience and network.  *Id.*  As is true of their prior communications in 2021 to investors and employees regarding discussions with Burke about potential employment, this is further evidence that Movants had no reason to believe that either their employment offer or the preceding discussions were improper in light of Burke's express assurances to them.

Burke started at Company A in October 2022.  Indictment ¶ 47.  In January 2023, however, Burke resigned, citing "an unexpected recurrence of a previous medical condition [Burke] had thought to have been in remission."  Ex. GG (January 2023 email exchange between C. Kim, R. Burke, and others) at 2.  With Burke's permission, Kim informed Company A personnel of Burke's departure, detailing Burke's continued support of the company.  *Id.* at 1.  Burke's counsel later stated publicly that Burke "partly left the organization due to 'personality conflicts.'"  Ex. HH (June 1, 2024 CNBC Article) at 3.

On May 30, 2024, the Indictment was filed in this case.  ECF 1.  It was unsealed the next day.

**Legal Standard**

Under Federal Rule of Criminal Procedure 14(a), "[i]f the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant[,] . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  In the D.C. Circuit, "three kinds of prejudice warrant relief under Rule 14: (1) the jury may cumulate evidence of the separate crimes; (2) the jury may improperly infer a criminal disposition and treat the inference as

evidence of guilt; (3) the defendant may become 'embarrassed or confounded' in presenting different defenses to the different charges.'"  *United States v. Gooch*, 665 F.3d 1318, 1336 (D.C. Cir. 2012) (quoting *Blunt v. United States*, 404 F.2d 1283, 1288 (D.C. Cir. 1968)); *see also United States v. McCaughey*, 605 F. Supp. 3d 84, 88 (D.D.C. 2022) ("Prejudice arises where there is 'a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993))).

Although "[j]oinder of conspiracy charges and defendants is preferred in this Circuit and in other Circuits," courts nevertheless "ha[ve] a continuing duty to monitor the appropriateness of joinder of counts and defendants."  *United States v. Edelin*, 118 F. Supp. 2d 36, 40 (D.D.C. 2000) (citing *Schaffer v. United States*, 362 U.S. 511, 516 (1960)).  Because this duty requires courts to "continue to be vigilant for prejudice arising under Rule 14 of the Federal Rules of Criminal Procedure," *id*, "[j]oinder will not . . . always be proper."  *United States v. Gray*, 173 F. Supp. 2d 1, 6 (D.D.C. 2001).  Ultimately, "Federal Rule of Criminal Procedure 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district court[]."  *United States v. Slatten*, 865 F.3d 767, 810 (D.C. Cir. 2017) (quoting *Zafiro*, 506 U.S. at 541) (internal quotation marks omitted).

## Argument

The Court should sever Burke's trial from Movants' trial because there is a serious risk that a joint trial of all three Defendants would prejudice Movants in violation of Rule 14(a) for two reasons.  First, evidence that speaks to Burke's alleged commission of the crimes charged in Counts Three, Four, and Five will unduly prejudice Movants, who have not been charged with those crimes.  Second, Burke's and Movants' respective anticipated defenses are likely in direct and irreconcilable conflict.  Movants will present evidence that, as early as April 2021 and months

prior to engaging in any meaningful employment discussions with him, Burke made—and they reasonably relied on—representations to them in the presence of another DOD official that he could lawfully act as an "ambassador" for Company A and engage in employment discussions even while in a position to influence the award of a contract to Company A. Burke, on the other hand, will likely argue that, consistent with his written representations to the Navy that are the basis of certain charges against him in the Indictment, he did not engage in meaningful employment discussions with Company A until over a year later in May 2022 and well after Company A obtained the contract at issue in the Indictment. Additionally, Movants will present evidence at trial that they were unaware that the senior Naval official who joined Burke at their July 21, 2021 lunch meeting was also Burke's "companion." In fact, Movants understood that she was there to vet the propriety of Burke's employment discussions with Movants. By contrast, Burke was of course well aware of his personal relationship with the senior Naval official, and by concealing this information from Movants may have misled them about her true purpose at the lunch meeting, which Movants anticipate Burke would deny. As described further below, these positions are in direct conflict. This is by no means the only evidence Movants will present of Burke's potential deception, but they are illustrative of why the Court should sever the trials.

## I.   EVIDENCE CONCERNING COUNTS THREE, FOUR, AND FIVE WILL PREJUDICE MOVANTS

Evidence tending to prove Burke's commission of the crimes alleged in Counts Three, Four, and Five would be inadmissible against the Movants were they tried separately from Burke, rendering a joint trial prejudicial. These Counts relate to allegedly false statements that Burke made to the Navy and other acts of concealment by Burke, Indictment ¶¶ 45-46, and evidence of these allegations would invite the jury to improperly consider the evidence against Movants. Where evidence of one defendant's wrongdoing could "prevent the jury from making a reliable

judgment about [another defendant]'s guilt or innocence," *Zafiro*, 506 U.S. 534 at 539, severance is warranted.

In *Zafiro*, the Supreme Court recognized that a risk of prejudice "might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* The Supreme Court has further recognized that severance "may be proper when defendants have 'markedly different degrees of culpability.'" *Zafiro*, 506 U.S. at 539; *see also United States v. Lewis*, Case No. 1:19-cr-307-RCL, 2022 WL 1090612, at *3 (D.D.C. Apr. 11, 2022) (quoting *Zafiro*, 506 U.S. at 539). That is, where there are "disparities in the 'weight, quantity, or type' of evidence against the moving defendant and other co-defendants such that a jury could not 'reasonably compartmentalize the evidence introduced against each individual defendant,'" severance is proper. *Id.* (quoting *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991)).

## A.    Burke Is Significantly More Culpable Than Movants And The Jury Will Be Invited To Use Evidence Of His Crimes Against Movants

Burke is responsible for the majority of the conduct alleged in the Indictment, and for Movants' good-faith reliance on his assurances as to the propriety of their employment discussions. Burke represented to Movants that he could act as their ambassador with the Navy. Regardless of whether he was correct, he made this representation to Movants in the presence of ██████████, another high-ranking DOD official, and Movants had no reason to disbelieve Burke, a four-star Admiral. What is more, Burke failed to inform the Navy that he had begun having discussions with Company A about potential employment as early as April 2021. But Movants are aware of no evidence of *their* knowledge that Burke was required to make that disclosure, or that he failed to do so at the right time. Indeed, Movants had no reason to think that Burke could not discuss employment, considering he did so in front of DOD Official ██████ in April 2021 and again at the

lunch meeting in July 2021 when he was joined by a senior Naval official who, unbeknownst to Movants, was also his "companion."

In fact, when considered from Movant's perspective, the presence of the senior Naval official at the lunch further underscores that they believed their actions were proper. It is implausible that Movants would have knowingly discussed an unlawful scheme to bribe a high-ranking Naval official in front of another senior Naval official *whom they had never met and who they were unaware was in a personal relationship with Burke*. To be sure, the presence of the senior Naval official, who ostensibly was appearing in her official capacity, indicated to the Movants that they were making significant progress towards a legitimate and long-lasting business relationship with the Navy. Only Burke would have been aware that she was his "companion" as alleged in the Indictment and was present in her personal capacity and perhaps aware of his motivations.

And while Burke eventually represented to the Navy that employment discussions began in May 2022, Indictment ¶ 46, (which is inconsistent with evidence available to the Movants that they began as early as April 2021), that was *after* Movants obtained the contract at issue. The Indictment alleges that Burke lied about the timing of the discussions in order to conceal the bribery scheme. Indictment ¶¶ 26, 46. Although the government presumably will present evidence at trial in support of its allegations against Burke, Movants know of no evidence that they were aware prior to the award of the contract or during its performance either that (a) Burke was prohibited from having employment discussions with them during the period charged in the Indictment or (b) he misled the Navy about the timing of the employment discussions. Indeed, the only evidence that Movants *ever* might have become aware of Burke's alleged misconduct and misrepresentations is Burke's May 2022 disqualification letter. But the timing of the letter—*over*

15

*a year after Burke and Movants first discussed Burke's potential employment, some 10 months after the July 2021 lunch meeting where they discussed terms, and after Burke was in a position to influence the Navy with respect to Company A*—eviscerates any probative value it may have of Movants' knowledge at the time they were seeking the $355,000 contract and discussing employment with Burke.  Even if the Government could present evidence that Movants read and understood the disqualification letter at the time they received it in May 2022 (after the bribery scheme is alleged to have been completed), that knowledge, of course, cannot apply retroactively to events that occurred in 2021 through January 2022.

Movants were civilians who had no knowledge of applicable Navy rules and, thus, no reason to question the representations of Burke, a four-star Admiral who held himself out as an authority on the Navy's rules and regulations.  Movants also were not present for any of Burke's discussions with Navy personnel about the rules surrounding his potential future employment. Indeed, Movants believed that everything they had done from their proposal to when they signed the contract was proper, as evidenced by their routine and detailed updates to Company A personnel and investors—none of whom is alleged to be a part of the charged conspiracy.  Yet a jury may nevertheless consider evidence of Burke's alleged misconduct—his alleged relationship with his "companion," his knowledge and understanding of Navy conflict rules, and the interactions he had with Navy personnel that Movants were not privy to—against Movants at a joint trial.

The allegations in the Indictment make clear that much of the most damning evidence that will be introduced at trial will speak to Burke's alleged misconduct, *his* knowledge of applicable rules, *his* disclosure obligations, and *his* acts of concealment.  The jury should not consider *any* of that evidence against Movants.  Burke not only is "distinctly [more] culpable," *United States v.*

*Jett*, 908 F.3d 252, 276 (7th Cir. 2018); *see also United States v. Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976) ("Particularly where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that that guilt will improperly 'rub off' on the others."), but the admission of evidence proving his misconduct at a joint trial would severely prejudice Movants because it would prevent the jury "from making a reliable judgment about [Movants'] guilt or innocence." *Zafiro*, 506 U.S. 534 at 539; *see United States v. Gray*, 292 F. Supp. 2d 71, 87 (D.D.C. 2003) ("[A] court should sever a joint trial where evidence against the one defendant would be 'far more damaging' than the evidence against the other.") (citing *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1988)).  For these reasons alone, separate trials are warranted.

**B.     Jury Instructions Cannot Cure Prejudice To Movants**

Critically, the Court should prioritize "severance over curative jury instructions" in this case.  *Gray*, 173 F. Supp. 2d at 7 (citing *Edelin*, 118 F. Supp. 2d at 42); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) ("[S]ome occurrences at trial may be too clearly prejudicial for . . . a curative instruction to mitigate their effect.").  Jury instructions, no matter how artfully drafted, cannot overcome the cumulative effect of listening to weighty, inculpatory evidence of Burke's criminal conduct specifically.  Burke apparently disregarded Navy conflict rules when he discussed joining Company A with Movants.  Burke apparently misrepresented to Navy personnel when those conversations began.  And Burke apparently failed to disclose his potential financial stake in Company A.  That is precisely why Burke alone is charged in Counts Three, Four, and Five.

But the evidence proving Burke's criminal conduct introduced at a joint trial is unlikely to be considered by the jury against Burke alone.  The Government will argue that Burke's lies were vital to the success of the alleged bribery scheme, specifically that they were necessary for Burke

to engage in employment discussions and for Company A to obtain the contract; after all, had Burke been truthful, the government will contend, presumably the Navy would have warned him and Company A to refrain from employment discussions and/or would not have awarded Company A, or even considered Company A for, the contract.  At bottom, even an appropriately instructed jury will find it difficult to consider the substantial evidence of Burke's alleged misconduct in a vacuum.  In other words, a strong case against Burke will necessarily become a strong case against Movants even absent comparable proof of Movants' misconduct and despite the Movants' reasonable reliance on Burke.  *See O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977) ("[T]he cleansing effect of the cautionary instructions in this case is dubious for, as the trial judge himself observed during the trial, 'you can throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good.'").  Simply put, the "dramatic disparity of evidence," *United States v. Slade*, 627 F.2d 293, 309-10 (D.C. Cir. 1980), in this dispute calls for severance over curative instruction.

## II.    CONFLICT BETWEEN BURKE AND MOVANTS WILL PREJUDICE MOVANTS

There is also a serious risk that a joint trial will prejudice Movants due to conflicts between Movants' and Burke's defenses.  Courts of appeals regularly recognize that such a risk warrants severance.  For example, in *United States v. Gonzalez*, the Eleventh Circuit stated that "'[i]f the jury, in order to believe the core of the testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant,' severance is compelled.  In that situation, the co-defendants 'become the government's best witnesses against each other.'"  804 F.2d 691, 695 (11th Cir. 1986) (quoting *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. 1981)).  Similarly, in *United States v. Tootick*, the Ninth Circuit explained that "[t]he joinder of defendants advocating mutually exclusive defenses can have a prejudicial effect

upon the jury, and hence the defendants, in a number of ways."  952 F.2d 1078, 1082 (9th Cir.

1991).  The court explained that:

> Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor.

*Id.*; *see also Lewis*, 2022 WL 1090612, at *4 ("Mutual antagonism between defenses can also

prejudice a defendant when the co-defendant's counsel 'bec[omes] in effect a second prosecutor.'"

(quoting *United States v. Wright*, 783 F.2d 1091, 1096 (D.C. Cir. 1986)).

At trial, Movants are likely to present evidence and argument that they are not guilty of

Counts One and Two because: (1) as civilians, it was reasonable for them to rely in good faith on

Burke's representation that Company A was not a "defense contractor" and, accordingly, he could

act as their ambassador in connection with their relationship with the Navy; and (2) consistent with

their reasonable reliance on Burke's assurances and actions, Movants had no reason to believe that

they were precluded from discussing with Burke potential future employment with Company A.

Burke was a four-star Admiral; the entire Navy relied on his integrity and compliance with

applicable rules.  It hardly was unreasonable for Movants to do the same.

In contrast, Burke may argue that: (1) he only started meaningful employment discussions

with Company A in May 2022 (and no earlier), which would be consistent with the materials he

provided to the Navy; and (2) Movants misrepresented the nature of their discussions with him in

2021 or simply misunderstood the nature of those early conversations.  Burke may also argue that

he never represented to Movants that it was proper for Burke to act on Company A's behalf

because Company A is not a (disqualifying) defense contractor.

19

In any case, believing Burke necessarily requires the jury to reject Movants' defenses. Either Burke began employment discussions with Company A in May 2022, as he represented to the Navy, or he began them as early as April 2021 as Movants are likely to contend. Either way, the jury will be presented with the spectacle of co-defendants taking wholly inconsistent positions about a matter central to the allegations against them, namely whether and when employment discussions commenced between Movants and Burke. *See, e.g.*, *Gray*, 292 F. Supp. 2d at 87 ("A court should also grant severance where the defendants allege mutually contradictory and irreconcilable defenses.") (citing *Tarantino*, 846 F.2d at 1398); *United States v. Troiano*, 426 F. Supp. 2d 1129, 1135 (D. Haw. 2006); *see also Gonzalez*, 804 F.2d at 695 ("The jury, in order to believe the testimony offered by Lopez . . . had to disbelieve Gonzalez[.]").

To the extent that Burke concedes that he (i) told Movants that he could act on their behalf, and/or (ii) discussed working for Company A in 2021 because he believed his actions were permissible, a joint trial would still prejudice Movants. Evidence to the contrary—that Burke was familiar with Navy rules and, in fact, knew that his conduct was improper—is only admissible against Burke and does not refute in any way Movants' more limited argument that they reasonably relied on Burke's statements. For Movants, whether Burke lied to the Navy or was familiar with Naval rules is of no moment. What *is* important to Movants is that Burke made clear representations to Movants upon which they relied. At a joint trial, however, the jury may reject Movants' reliance argument based entirely on evidence that *Burke* knew that *his* actions were wrong. Thus, even defenses that on their face appear parallel are not when considered in light of the evidence that will be offered to refute them. Evidence that speaks to Burke's mental state may prevent the jury "from making a reliable judgment about [Movants'] guilt or innocence." *Zafiro*, 506 U.S. 534 at 539.

Movants' defenses will further call into question Burke's credibility.   Movants may introduce evidence that Burke was dishonest with them regarding his ability to act on their behalf and the circumstances surrounding his departure from Company A.   In a joint trial, this would create what the Ninth Circuit has described as a "perverse incentive[]" to retaliate.   *Tootick*, 952 F.2d at 1082.   In response, Burke may seek to introduce evidence aimed not at proving his innocence, but instead aimed at proving Movants' culpability or simply disproving specific arguments made in support of Movants' defense.   For example, Burke might attempt to prove that Movants knew that Naval conflict rules precluded Burke from speaking with them—a fact that has no bearing on Burke's guilt or innocence, but instead speaks directly to Movants' credibility/culpability.   Similarly, Burke might also attempt to impeach Movants' witnesses, to the extent their testimony inculpates Burke.

This course of events would pit defendants against one another and detract from the truth-seeking process.   Courts have accordingly recognized that "[h]aving [one defendant] be [the other's] most forceful adversary could significantly reduce the burden of proof on the Government," *United States v. Monge*, 2011 WL 13176072, at *2 (D. Ariz. July 14, 2011), despite defendants' right to a fair trial.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant their joint motion and sever their trial from the trial of Robert Burke.

Respectfully submitted,

DATED July 19, 2024

*/s/ William A. Burck*
William A. Burck

| | |
|---|---|
| Steven Alan Metcalf, II | William A. Burck (DC Bar No.: 979677) |
| METCALF & METCALF, P.C. | Avi Perry (*admission pending*) |
| 99 Park Avenue, 6th Floor | Rachel G. Frank (DC Bar No.: 1659649) |
| New York, NY 10016 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| Tel: (646) 253-0514 | 1300 I Street NW, Suite 900 |
| Fax: (646) 219-2012 | Washington, D.C.  20005 |
| fedcases@metcalflawnyc.com | Tel: (202) 538-8000 |
| | Fax: (202) 538-8100 |
| Rocco F. D'Agostino (*pro hac vice*) | williamburck@quinnemanuel.com |
| 445 Hamilton Ave., Suite 605 | aviperry@quinnemanuel.com |
| White Plains, NY 10601 | rachelfrank@quinnemanuel.com |
| Tel: (914) 682-1993 | |

*Counsel for Defendant Meghan Messenger*

Christopher Clore (*pro hac vice pending*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-8100
christopherclore@quinnemanuel.com

*Counsel for Defendant Yongchul "Charlie" Kim*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, a copy of the foregoing Memorandum of Law was electronically filed with the Clerk of the U.S. District Court for the District of Columbia via CM/ECF and served to all counsel of record via electronic mail.

 /s/ *William A. Burck*
William A. Burck (DC Bar No.: 979677)

Dated: July 19, 2024