**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

United States of America

v.

Robert P. Burke, Yongchul "Charlie" Kim,
and Meghan Messenger,

              Defendants.

**Case No. 1:24-cr-00265-TNM**

**REDACTED**

**REPLY IN SUPPORT OF DEFENDANTS YONGCHUL "CHARLIE" KIM'S AND
MEGHAN MESSENGER'S JOINT MOTION TO SEVER TRIAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................................ii

ARGUMENT ........................................................................................................................1

I.     SEVERANCE IS COMPELLED BY THE CONFRONTATION CLAUSE ......................2

II.    THE JURY WILL USE EVIDENCE OFFERED AGAINST BURKE TO
       CONVICT MOVANTS .......................................................................................4

       A.     The Evidence Against Burke Is Significantly More Damning Than The
              Evidence Against Movants ...................................................................5

       C.     The Government Is Wrong that Jury Instructions Can Cure The Prejudice
              To Movants ....................................................................................14

III.   CONFLICT BETWEEN BURKE AND MOVANTS WILL PREJUDICE
       MOVANTS ...................................................................................................15

CONCLUSION....................................................................................................................19

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bruton. Davis v. Washington*,
547 U.S. 813 (2006) ................................................................................................................ 2

*Bruton v. United States*,
391 U.S. 123 (1968) ....................................................................................................... 1, 2, 12

*Crawford v. Washington*,
541 U.S. 36 (2004) ................................................................................................................. 2

*Drew v. United States*,
331 F.2d 85 (D.C. Cir. 1964) ............................................................................................. 4, 11

*Elonis v. United States*,
575 U.S. 723 (2015) ............................................................................................................. 13

*Gregory v. United States*,
369 F.2d 185 (D.C. Cir. 1966) .............................................................................................. 11

*Ocasio v. United States*,
578 U.S. 282 (2016) ............................................................................................................. 14

*Richardson v. Marsh*,
481 U.S. 200 (1987) ............................................................................................................... 3

*United States v. Baker*,
98 F.3d 330 (8th Cir. 1996) .................................................................................................. 15

*United States v. Edelin*,
118 F. Supp. 2d 36 (D.D.C. 2000) ........................................................................................ 17

*United States v. Eiland*,
406 F. Supp. 2d 46 (D.D.C. 2005) ........................................................................................ 11

*United States v. Ford*,
155 F. Supp. 3d 60 (D.D.C. 2016) .......................................................................................... 3

*United States v. Foutz*,
540 F.2d 733 (4th Cir. 1976) ................................................................................................ 11

*United States v. Gray*,
No. 104CR580, 2005 WL 1126733 (N.D. Ohio May 3, 2005) ................................................ 11

*United States v. Jackson*,
588 F.2d 1046 (5th Cir. 1979) .............................................................................................. 11

*United States v. Jones*,
16 F.3d 487 (2d Cir. 1994) ................................................................................................... 14

*United States v. Leonard*,
494 F.2d 955 (D.C. Cir. 1974) .............................................................................................. 17

*United States v. Lucas*,
   67 F.3d 956 (D.C. Cir. 1995) ................................................................ 13

*United States v. Mardian*,
   546 F.2d 973 (D.C. Cir. 1976) .............................................................. 14

*United States v. McCarter*,
   316 F.3d 536 (5th Cir. 2002) ................................................................ 14

*United States v. Sampol*,
   636 F.2d 621 (D.C. Cir. 1980) .............................................................. 14

*United States v. Straker*,
   800 F.3d 570 (D.C. Cir. 2015) ................................................................ 3

*United States v. Washington*,
   952 F.2d 1402 (D.C. Cir. 1991) .............................................................. 2

## **Statutes**

10 U.S.C. § 934 ................................................................................................ 13

18 U.S.C. § 201(b)(2)(A) .................................................................................... 8

18 U.S.C. § 208(a) .............................................................................................. 8

18 U.S.C. § 1001(a)(1) ........................................................................................ 8

## **Other Authorities**

Fed. R. Evid. 404(b) .......................................................................................... 11

**ARGUMENT**

Defendants Yongchul "Charlie" Kim and Meghan Messenger (together, "Movants") respectfully submit this reply brief in further support of their joint motion for severance. Movants further request oral argument on the motion and will be prepared as early as the status conference scheduled for September 23, 2024.

Severance is warranted for three key reasons. *First*, the Confrontation Clause requires severance. The government is expected to introduce evidence (a recorded confession by co-Defendant Robert Burke) that would violate Movants' confrontation rights if offered at a joint trial. The government fails entirely to apprise the Court of this constitutional issue in their opposition brief. *Second*, the government is wrong that a limiting instruction can cure the substantial prejudice to Movants from the admission of damning evidence that *only* relates to Counts Three, Four, and Five, in which Burke is the only defendant charged. *Third*, Burke's brief confirms that Movants' anticipated defense is in direct and irreconcilable conflict with his. The government's reductive argument that all defenses are aligned because "[t]he defendants all claim that there was never a *quid pro quo*," Opp. 26, elides the crucial distinction as to *why* each defendant denies the Indictment's allegations. Burke appears to deny a *quid pro quo* because he claims he did not engage in formal job discussions until May 2022. Movants, on the other hand, intend to argue they lacked a culpable mental state because they reasonably relied on Burke's assurances that their job and contract discussions in 2021 were lawful. At bottom, the government can identify no reason beyond efficiency and default presumptions to try all three defendants together, but those interests must yield here to Movants' constitutional rights and the unavoidable risk that a joint trial will unfairly prejudice Movants.

## I.      SEVERANCE IS COMPELLED BY THE CONFRONTATION CLAUSE

In a joint trial, the Sixth Amendment's Confrontation Clause prohibits the admission of one defendant's pretrial confession if the confession inculpates a co-defendant, unless the co-defendant is given the opportunity to cross-examine the confessor.  *Bruton v. United States*, 391 U.S. 123, 126, 136-37 (1968).  A limiting instruction is not "an adequate substitute for [the] constitutional right of cross-examination."  *Id.* at 137.  *Bruton* applies to a co-defendant's testimonial statement that "expressly implicates the defendant," and as such, is "so incriminating that it constitutes an exception to the general proposition that a judge's limiting instruction will prevent any improper use of the statement by the jury."  *United States v. Washington*, 952 F.2d 1402, 1404-05 (D.C. Cir. 1991) (quoting *Bruton*, 391 U.S. at 124 n.1) (cleaned up).

Here, the government is expected to introduce at trial certain oral statements made by Burke during a recorded "knock-and-talk" interview with DCIS and NCIS agents on October 3, 2023.  Burke, in essence, confessed to the charged offenses in these statements he made to the agents.  The admission of these statements at a joint trial is plainly barred by the Confrontation Clause.  "'[I]nterrogations by law enforcement officers fall squarely within [the] class' of testimonial hearsay" covered by *Bruton*.  *Davis v. Washington*, 547 U.S. 813, 826 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53 (2004)).  ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████     ███████████     ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Burke's confession is clearly admissible against him at trial, requiring severance of Movants' trial from his.  While in some cases "*Bruton* can be complied with by redaction," *Richardson v. Marsh*, 481 U.S. 200, 209 (1987), that is true only if the incriminating statement is "redacted to eliminate not only the defendant's name, but any reference to his or her existence," *id.* at 211.  Only when "(1) the jury is instructed to consider the confession against the declarant only, and (2) redactions are made such that the statement, together with other trial evidence, neither expressly identifies defendants nor creates any inevitable association between them and the criminal activity the statement describes, there is no Sixth Amendment violation." *United States*

---

[1] ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████ ███████████████████████████████████████████

███████████████████████████████████

[2]  On multiple occasions, and contrary to Burke's claim, Burke invited Movants to move communications off-channel.  *See* ECF 27-32 at 1 ("I'm also on What's App at that number, which avoids international long distance charges. But let me call you if you prefer."); ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

*v. Straker*, 800 F.3d 570, 595, 597 (D.C. Cir. 2015) (discussing how putatively anonymized references to a defendant in a co-defendant's statement violated *Bruton* where the statement still called attention to the declarant's accusation); *see United States v. Ford*, 155 F. Supp. 3d 60, 68 (D.D.C. 2016). Redaction is simply not possible here because the entire conversation focused on Burke's relationship with Movants. This is a bribery case in which the government alleges that two defendants bribed the third. There is no way of anonymizing Burke's confession that obfuscates whom he is implicating.

Worse, Burke's statements are clearly self-serving and meant to minimize his criminal exposure while suggesting that Movants—civilians with little experience navigating naval ethics procedures—are more culpable. There is no reason to credit Burke's statements which, if admitted at a joint trial, would be highly prejudicial to Movants, even if Burke took the stand and was subject to cross-examination.[3]

It is surprising that the government has not apprised the Court of its intention to use Burke's confession and the attendant abridgment of Movants' constitutional rights. But the impact is clear: severance is warranted to prevent a violation of Movants' Sixth Amendment rights.

## II.   THE JURY WILL USE EVIDENCE OFFERED AGAINST BURKE TO CONVICT MOVANTS

A joint trial also would severely prejudice Movants because (1) the jury likely will use evidence of Burke's guilt—including on the counts in which Burke is the sole defendant—to establish Movants' criminal disposition, and (2) limiting instructions will be entirely ineffective. *See Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964).

---

[3] Of course, it is Burke's right to testify or not, but the decision likely will not be made until after the close of the government's case-in-chief, at which time Burke's confession already will have been introduced to Movants' prejudice.

A.     **The Evidence Against Burke Is Significantly More Damning Than The Evidence Against Movants**

The government is wrong that there is equally strong evidence against each defendant.  In fact, the evidence against Burke is significantly more incriminating.  *First*, the government secured a recorded confession from Burke, not from Movants.  *See supra* Section I; *see generally* Ex. A.  That alone creates a massive disparity in the evidence across the defendants.  And, as described below, ██████████████████████████████████████████████████

██████████████████████████████   ████████████████████████████████

████████████████████████

*Second*, with context, the exchanges highlighted in the government's opposition are not nearly as probative of Movants' alleged "participation in the scheme" as the government suggests.  Opp. 23.  The government's first example involves a 2023 "Negative Predictions" email.  *Id.* at 19-20.  What the government fails to acknowledge, however, is that this email reflects an internal mental health "homework" exercise, as reflected in the subject line of the email, in which Messenger would imagine a number of exaggerated and untrue propositions, no matter how unfounded, to facilitate open and honest communication brainstorming.[4]  In this email, Messenger writes from *Burke*'s perspective and, far from making an admission, is simply sharing with Kim her worst, albeit baseless, fears and predictions.  In fact, in that same email, Messenger wrote *to Kim* that they were not friends, which is clearly untrue and no more a valid reflection of the state of Movants' relationship than her statement about Burke was of Movants' culpability.

---

[4]  Company A employees routinely practice this technique for mental health reasons.  As indicated above, the email includes a number of baseless predictions, which is part of the "homework" exercise.

The government next cites (1) an April 2021 email exchange between Kim and Company A personnel in which Kim states that "when Burke stepped away for a second [Messenger] felt slimy [Burke] wants to work for us but we're asking for a deal first," and (2) a late 2022 text exchange between Movants in which Messenger states that she "was shoving down [her] anger except 1 outburst saying no contract no job."  Ex. C at 1 (April 2021 email exchange between G. Kunkel, C. Kim, and others); ███████████████████████████████████ Opp. 9, 19, 23.  Both exchanges are taken out of context.  ████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████ ██████ ███████████████████████████████

██████████████████████████████████████████████████████████████████████

Specifically, if Burke's connections in the Navy—while employed there—were insufficient even to provide Movants with clarity as to the status of their contract negotiations, why should Movants be confident that Burke would be a valuable member of their team if hired?  Indeed, after Burke communicated to Movants in late 2019 that they had secured a major engagement with the Navy, *see* ECF 27-20 at 1, Movants were understandably upset when Burke failed to deliver as messaged.

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████  In any event, even absent these reasonable explanations, these three exchanges—considered individually or as a whole—are insufficient to support the

---

[5] ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

government's contention that the evidence against all three defendants is equally damaging, particularly where there are *three charges that only involve Burke's alleged misconduct*.

*Third*, Movants' lack of criminal intent is bolstered by their reasonable reliance on Burke for direction. Burke was a high-ranking, four-star Admiral who had previously headed the Navy's human resource component. He had a comprehensive understanding of the ins and outs of the Navy's contracting process and ethics rules. *See* ECF 29-1 at 1 ("I'll sit down with you and Meghan as situations arise and advise you on the Navy/DoD rules anytime . . . ."). Movants, on the other hand, were private-sector, civilian business owners completely unfamiliar with naval rules and regulations and willing to take direction from Burke, an individual they reasonably believed was both familiar with those rules and regulations and likely to abide by them. It is not surprising that Movants relied (to their detriment, evidently) on Burke's integrity and judgment; he was Commander of U.S. Naval Forces in Europe and Africa—the entire United States and NATO relied on his integrity and judgment. And, in fact, Movants did follow Burke's lead.[6] *See* ECF 27-29 at 1 ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ This fact alone speaks directly to Movants' lack of criminal intent and highlights the crucial link between Burke's position in the Navy and the alleged

---

[6] In this respect, Movants are positioned no differently than Burke's "companion," who also fell victim to one of the highest-ranking Naval officers' deceptions. ████████████████ ██████████████████████████████████████████ ████████████████████████████████

criminal conduct—a point that further proves the evidentiary imbalance between Movants and Burke.

*Fourth*, the record is replete with clear examples of Burke's misrepresentations, but none are attributable to Movants. For example, Burke repeatedly misrepresented to the government the status of his employment discussions with Company A. Indictment ¶ 46. Further, Burke lied to federal agents during a voluntary interview. ███████████████████████████████ ███████████████████████████████████████ And Burke took significant steps to conceal and destroy evidence of his relationship with his "companion," a fact the government will surely use to prove Burke's consciousness of guilt. ████████████████████████████ ████████████████████████████████████████████████████ ███████████████████    █████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████

In contrast, Movants openly and transparently broadcasted their prospective engagement with Burke to investors and other Company A personnel (none of whom is alleged to be a co-conspirator), a point which the government inexplicably assigns no weight. *See* Opp. 8-9, 12. Unlike Burke, Movants were honest brokers who had no issue telling the world about their dealings because they did not believe that what they were doing was wrong.

*Fifth*, there are three counts in the Indictment in which Burke is the sole defendant. Counts Three, Four, and Five charge Burke alone with seeking and receiving a bribe as a public official, in violation of 18 U.S.C. § 201(b)(2)(A), acts affecting a personal financial interest while employed as a public official, in violation of 18 U.S.C. § 208(a), and concealment of material facts, in violation of 18 U.S.C. § 1001(a)(1), respectively. Thus, all evidence introduced as to three of

five charged counts should not be considered against Movants. Neither the charges nor the evidence tending to prove Burke's commission of the conduct alleged in these counts have any bearing on Movants' culpability. Indeed, these charges are premised almost entirely on Burke's status in the Navy and his responsibilities that stemmed therefrom.

The government's play is clear. Lacking sufficient evidence to convict Movants on their own, the government is relying on prejudicial spillover from its case against Burke. The evidence against Burke includes, at a minimum, his recorded confession, his private text messages with his "companion," and his statements to the Navy about commencing job discussions with Company A in July 2021. *None* of this evidence would be admissible against Movants. By contrast, the government's case against Movants seems to consist of their (misconstrued) emails and the anticipated testimony of Burke's "companion"—who met Movants once, lied to Movants about her relationship with Burke, evidently had no issue with Burke's arrangement with Company A when she stood to benefit financially from it, now has an obvious jilted-lover bias, and has a documented history of perjury and fabrication of evidence. Based on a review of the government's unrealistic 80-person prospective witness list, the investigative memoranda provided in discovery, and the grand jury testimony, this "companion" appears to be the *only* witness who may provide first-hand inculpatory evidence against Movants, and even she is on record that, although she

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████     In fact, the expected testimony of Burke's "companion" actually corroborates Movants' anticipated defense and highlights the conflict with Burke's defense, assuming she testifies consistently with her exculpatory pretrial statement to the government about

Movants: ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

In other words, the issue with a joint trial is not just that the government's evidence against Burke is materially stronger, it's that the government lacks admissible evidence to convict Movants on their own.[7]  The Court should not allow them to compensate for this deficit by relying on the predictable spillover effect of powerfully inculpating evidence that is admissible only against Burke.

In sum, there is a marked disparity in the quantum and quality of evidence against Burke and Movants, and a substantial portion of the government's evidence offered at trial will necessarily be relevant only to Burke's conduct.  Because this evidence will unquestionably and irreparably prejudice Movants, severance is necessary here.

---

[7]  In this vein, the government paints Movants as desperate for a contract, but it neglects to point out how: (1) Movants first selected the Navy as Company A's contracting partner, ████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ and (2) Navy personnel reiterated their interest in Movants' services, ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ECF 27-24 at 1 ("We really appreciate the energy you have put into this and there is an obvious appetite from across many communities and stakeholders."); ECF 27-28 at 1 ("[Burke] indicated devGPS solves the problems and challenges [the Navy is] facing").

## B.        The Government's Arguments to the Contrary Are Unpersuasive

*First*, the government is simply incorrect that, even if Movants were tried separately, evidence as to Counts Three, Four, and Five would still be admissible against them.  *See* Opp. 21. At a separate trial, evidence that is relevant to those counts (which only charge Burke with criminal conduct) would certainly not be admissible against Movants as direct evidence, *see United States v. Jackson*, 588 F.2d 1046, 1055 (5th Cir. 1979) ("It is generally improper to introduce evidence of misconduct not charged in the indictment."), and it would be equally inadmissible under Federal Rule of Evidence 404(b), *see Gregory v. United States*, 369 F.2d 185, 189 (D.C. Cir. 1966) ("[W]here evidence of more than one crime is offered to the jury because more than one crime is charged in the indictment, the evidence as to all crimes charged tends to cumulate to prove each, thus prejudicing the defendant in his right to a separate consideration of his guilt or innocence on each charge" (citing *Drew*, 331 F.2d at 91)).  If tried jointly, however, Movants will be unfairly and improperly subject to negative inferences based exclusively on evidence tending to prove only Burke's guilt.  Such an outcome would prejudice the jury and impair Movants' ability to fairly defend themselves.[8]  *See, e.g.*, *United States v. Gray*, No. 104CR580, 2005 WL 1126733, at *4 (N.D. Ohio May 3, 2005) (evidence relating to tax charges not otherwise admissible at trial on

---

[8]  The government further claims that *United States v. Eiland*, 406 F. Supp. 2d 46 (D.D.C. 2005), is applicable here and provides justification for declining to sever Movants' trial from Burke's.  Not so.  *Eiland* involved a sprawling RICO conspiracy with charges that varied across defendants but that were directly tied to each defendants' participation in the larger charged RICO conspiracy.  While certain defendants were also charged with other crimes, including murder, conspiracy to commit murder, and various narcotics offenses, each was related—directly or indirectly—to their participation in the underlying RICO conspiracy.  *Eiland*, 406 F. Supp. 2d at 53.  Invoking the unique nature of a RICO conspiracy, the court reasoned that severance was not warranted because "it is not presumptively unfair for them to be presented in trials of those conspiracies, even if not all co-conspirators are charged with directly participating in those crimes."  *Id.*  Unlike in *Eiland*, the government's allegations giving rise to Counts Three, Four, and Five, against Burke cannot be attributed to Movants, and therefore, the risk of prejudicial spillover to Movants remains.

non-tax charges "would cause substantial and compelling prejudice to [defendant's] right to a fair trial on the non-tax charges"); *Gregory*, 369 F.2d at 189; *United States v. Foutz*, 540 F.2d 733, 738 (4th Cir. 1976) (when one part of the government's case is weaker than another, a court cannot assume that the jury will properly compartmentalize the evidence into "separate intellectual boxes" (quoting *Bruton v. United States*, 391 U.S. 123, 131 (1967)) (quotation marks omitted)).

*Second*, as described above, the disparity of evidence against Burke, as compared to Movants, is significant.  For instance, in a private WhatsApp exchange on July 24, 2021 ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ This exchange plainly undercuts Burke's defense (that he only began job discussions in 2022), but it does not undermine at all Movants' defense.  In fact, the "companion's" palpable excitement about the job/contract discussions undermines her post-facto claim (after Burke abandoned their relationship) that she recognized the discussions to be unlawful at the time. Relatedly, it is crucial to understand that Burke and his "companion" misled Movants about their romantic relationship, such that Movants were unaware the "companion" was not another government official—underscoring the unlikelihood that Movants knowingly would have discussed a secret, illegal bribery scheme in front of her.  The record is clear on this point. ████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

Burke agreed, and stated, ██████████████████████████████████ In the

same text message exchange, ████████████████████████████████████████

████████████████████████████ █ ████████

Nevertheless, the government claims that "there is 'substantial and independent evidence of each' of the defendants' 'significant involvement in the conspiracy.'"  Opp. 22.  The government's argument is wrong and appears to be based, at least in part, on its assertion that Movants do not need to know military ethics rules to commit bribery.  *See* Opp. 29 ("Whether Kim and Messenger understood government ethics rules is irrelevant to the offenses with which they are charged.").  But it is black-letter law that, to be convicted, Movants must have known that their actions were wrongful.  *Elonis v. United States*, 575 U.S. 723, 734 (2015) ("[T]he 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" (internal citation omitted)).  The government bizarrely ignores their obligation to prove Movants' culpable mental state, and downplays the link between Movants' reliance on Burke for direction and their genuine and reasonable belief that their actions were legal.  Movants are not arguing that they are not guilty because they were unfamiliar with military ethics rules, but rather, that they are not guilty because, based on Burke's representations to them, they did not know that their conduct was wrongful.

Moreover, as described above, Movants reasonably relied on Burke for direction.  This is the crux of Movants' defense and speaks directly to the absence of criminal intent on their part.  *See United States v. Lucas*, 67 F.3d 956, 960 (D.C. Cir. 1995) ("[K]nowledge is fundamental, because without knowledge there could no criminal purpose or intent.  Obviously, absence of proof of knowledge is fatal to the Government's case.").  Importantly, this defense is wholly at odds with

---

[9]  Furthermore, while there is no evidence that Movants had any knowledge of Burke's extramarital relationship, in violation of 10 U.S.C. § 934, there is a high likelihood that this fact will prejudice Movants at trial.

Burke's anticipated defense, and it demonstrates the connection between Burke and his position in the Navy and *all* of the criminal conduct alleged in the Indictment. In other words, not only is the record devoid of any independent evidence of Movants' involvement in a conspiracy; there can be no conspiracy when one party's involvement is based entirely on the misrepresentations of the other. *See Ocasio v. United States*, 578 U.S. 282, 287 (2016) ("[T]he fundamental characteristic of a conspiracy is a *joint* commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" (internal citation omitted) (emphasis added)).

*Third*, the government incorrectly minimizes the relevance of *United States v. Mardian*, 546 F.2d 973 (D.C. Cir. 1976), to this case. *Mardian* recognizes that "where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that that guilt will improperly 'rub off' on the others." 546 F.2d at 977. That is plainly the case here and, for that reason alone, Movants' trial should be severed from Burke's.

## C.  The Government Is Wrong that Jury Instructions Can Cure The Prejudice To Movants

The D.C. Circuit has recognized that in certain cases, it is "unreasonable to expect that the jury [will] succeed[ ] in compartmentalizing the evidence" introduced at trial, even when properly instructed. *United States v. Sampol*, 636 F.2d 621, 647 (D.C. Cir. 1980); *see also United States v. McCarter*, 316 F.3d 536, 539 (5th Cir. 2002) (recognizing that "[a]lthough juries are generally presumed to have followed jury instructions," in certain cases, it is impossible for them to do so); *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) ("The presumption that a jury will adhere to a limiting instruction evaporates when there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense.").

Particularly in a conspiracy case like this one, "the risk of substantial prejudice from the spillover effect of the conspiracy evidence and the documents [can be] too high to be cured by less drastic measures, such as . . . limiting instructions." *United States v. Baker*, 98 F.3d 330, 335 (8th Cir. 1996). The government seeks to downplay the effect of a joint trial by pointing out that the evidence against Burke will not be "the most damning, " Opp. 24, but it cannot escape the fact that the Indictment contains allegations relating to Burke's conduct alone—much of which Movants had no knowledge of whatsoever. Moreover, as described in Section I, *supra*, Burke confessed his crimes to special agents, making the evidence against him significantly more damaging than that against Movants. No jury can be expected to follow the Court's instructions here and refrain from using incredibly powerful evidence of Burke's misconduct as proof of Movants' guilt.

## III.   CONFLICT BETWEEN BURKE AND MOVANTS WILL PREJUDICE MOVANTS

The government argues incorrectly that, at bottom, Movants and Burke offer the same defense—that there was no *quid pro quo*. *See* Opp. 26 ("The defendants all claim that there was never a *quid pro quo*"). But that's wrong. Burke appears to suggest (notwithstanding his recorded confession and WhatsApp chats with his "companion") there was no *quid pro quo* because he "deferred official [employment] discussions until May 2022, when he received authorization to have" them. Burke Mot. 6. Movants, by contrast, intend to argue they lacked the culpable mental state necessary for an unlawful *quid pro quo* principally because Burke assured them that they were not defense contractors and that their discussions thus were not prohibited. Moreover, even if the government was correct and all defenses aligned (they do not), the defendants would advocate different, and contradictory, theories of the case. Burke claims that he did not discuss employment with Company A until an appropriate time and that, as a result, his statements to the military about those discussions were accurate. Movants, on the other hand, do not dispute that

they and Burke discussed employment opportunities before Burke notified the military, but argue instead that they believed their job discussions were legal and consistent with military regulations based on Burke's misrepresentations.  As described by Burke, he and Movants take "starkly clashing position[s]," Burke Mot. 2, creating a "textbook example of mutually contradictory defenses," Burke Mot. 4.

Furthermore, as indicated by Movants in their opening memorandum and confirmed by Burke, Burke's trial defense will heavily rely on casting Movants and Company A in a negative light by "actively attempting to impeach [Movants'] credibility."  Burke Mot. 9.  Burke explains the types of evidence he plans to use to bolster his credibility, at Movants' prejudicial expense, including purported evidence suggesting that: (1) Movants had an expectation that Burke could "produce the government contracts they were hoping for," Burke Mot. 6; (2) "[p]art of the corporate culture at Company A included an approval from the highest levels of Company A that to get ahead or stay ahead you should lie, hide and fake until you no longer have to," Burke Mot. 7; (3) Messenger's statements during a leadership speech in which "she described herself as 'the best LHF (Lying, Hiding, Faker) you could find,'" Burke Mot. 7, and drew the comparison of "the lead (criminal) character in the movie 'Catch Me If You Can' to herself" are admissions of guilt,[10] Burke Mot. 7; (4) Company A's corporate climate was "dysfunctional" and "began to implode" because "Company A really did [not] have any business;" Burke Mot. 7; and (5) after "working [at Company A] for less than four months," Burke "quickly became disillusioned with the

---

[10]  This appears to refer to a keynote speech Messenger delivered at the Air Force Academy where she shared a vulnerable story as a female CEO in the technology industry.  Messenger covered the top challenge most leaders face, a psychological phenomenon called *imposter syndrome* which leads to self-criticism, overthinking, and negative self-talk.

company" based on his suspicion that the company had "a severe lack of substance," Burke Mot. 6-7.[11]

Just as Burke intends to caste Movants in a negative light, Movants intend to do the same to Burke.  To reiterate, Movants reasonably relied on Burke, who was ultimately introduced to Movants through high-ranking Navy personnel, whom Movants had no reason to distrust.[12] Furthermore, Movants had every reason to trust the Navy, who first sought them out, not the other way around.  Indeed, through the original inverted contracting process,[13] Company A chose between multiple high-caliber organizations, which led up to a decision between the Navy and Air

---

[11]   The Court would not glean from Burke's or the government's filings that the Office of the Secretary of Defense previously identified Company A as "best-in-class in leader development in practice."  ECF 27-3 at 4.  Separately, Company A was also identified by Harvard University professors as one of only three companies "who put learning and development at the heart of their corporate culture and strategy."  *Id.*  To help others and strengthen organizations, Movants offered their leadership training (attended by Navy personnel) for free long before it was monetized. Eventually, Movants decided to commercialize their training program to both meet the demand from organizations asking for help and to build a more sustainable model as investors asked Movants to decrease their amount of "giving."  This kicked off Movants' search for the right partner client.  *See* Ex. I at 8 ("Our selection process is to identify the organization with the highest likelihood of success from the seven we are spending the most time with: CIA, Air Force, Navy, JPMC, BofA, Fidelity, EY.").  Company A eventually chose between multiple high-caliber organizations. ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████  Over years of hard work, Company A and its leaders earned the Navy's sincere interest in its products and services leading up to *bona fide*, high-value engagements that predate any alleged bribery scheme.

[12] In 2015, a TedTalk speaker introduced Kim to an admiral in the Office of the Secretary of Defense, who later became a Navy ethics staffer.  That admiral introduced Movants to the Inspector General of the Navy, who asked for the Navy to be considered in Company A's selection process.  In 2017, the Inspector General of the Navy introduced Burke to Movants, further enhancing Burke's credibility and giving Movants greater reason to follow his lead.  Ex. I at 6 ("I will shortly connect you to one of our up and coming leaders . . . Vice Admiral Bob Burke . . . .  It would be good to get him personal experience with [Company A] . . . .").  This was in the window after two Navy ships had tragically collided, resulting in the death of sailors, bolstering the importance of Movants' leadership work.

[13] This "inverted-contracting process" entailed Company A selecting one winner, which was unlike a regular contracting process, which involved bidding.

17

Force. ███████████████████████████████████████████

████████████████████████████████████████████ Over

years of hard work, Company A earned the Navy's sincere interest in its products and services

leading up to *bona fide*, high-value engagements that predate any alleged bribery scheme. Burke

led Movants to believe that they would be able to achieve an all-Navy engagement—a $100 million

deal—and was enthusiastic about Movants' work.[14]  Movants, too, were enthusiastic about Burke,

who was, to them, their greatest champion in the Navy. Movants' reliance on Burke was ultimately

mistaken; Burke misled and deceived Movants and abused his authority as a high-ranking Navy

admiral. All told, Burke's self-interested statements in hindsight about Company A should not be

believed, and Movants intend to discredit Burke if given the opportunity at trial.

Because Movants' and Burke's defenses are irreconcilable and because Burke plans to

"actively impeach" Movants' credibility at trial, Movants satisfy the test for severance of whether

"the defendants present conflicting and irreconcilable defense and there is danger that the jury will

unjustifiably infer that the conflict alone demonstrates that both are guilty." *United States v. Edelin*,

118 F. Supp. 2d 36, 50 (D.D.C. 2000) (internal citation and quotation marks omitted). Even more,

a sufficient basis exists to sever trials because, as discussed above in Section II.A., the government

does not have "independent evidence of each defendant's guilt," *United States v. Leonard*, 494

F.2d 955, 967 (D.C. Cir. 1974). In these circumstances, it is reckless, at best, for the government

to insist on a joint trial. The Court should not condone it.

---

[14] *See* ECF 27-28 at 1 ("In the meeting, he indicated devGPS solves the problems and challenges they're facing."). While at Company A, Burke shared that he "joined [Company A] after the Navy because [he] did several projects with them and their approach really resonated with me . . . .[Company A] adds this element of science to leader development. I don't think anyone else in the industry does it the way that [Company A] does it." *Community Online Academy #134 Leadership in Practice #130 – The World is Sick and Getting Sicker*, YOUTUBE (Dec. 10, 2022), https://youtu.be/tnoDn_LLTfo?si=dO_skx2cH_6j-m4Ja.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant their joint motion and sever their trial from the trial of Robert Burke.


Respectfully submitted,

DATED September 16, 2024          */s/ William A. Burck*
                                  William A. Burck

Steven Alan Metcalf, II           William A. Burck (DC Bar No.: 979677)
METCALF & METCALF, P.C.           Avi Perry (DC Bar No. 90023480)
99 Park Avenue, 6th Floor         Rachel G. Frank (DC Bar No.: 1659649)
New York, NY 10016                QUINN EMANUEL URQUHART & SULLIVAN, LLP
Tel: (646) 253-0514               1300 I Street NW, Suite 900
Fax: (646) 219-2012               Washington, D.C.  20005
fedcases@metcalflawnyc.com        Tel: (202) 538-8000
                                  Fax: (202) 538-8100
Rocco F. D'Agostino (*pro hac vice*)  williamburck@quinnemanuel.com
445 Hamilton Ave., Suite 605      aviperry@quinnemanuel.com
White Plains, NY 10601            rachelfrank@quinnemanuel.com
Tel: (914) 682-1993

                                  Christopher Clore (*pro hac vice*)
*Counsel for Defendant Meghan*     QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Messenger*                        51 Madison Ave, 22nd Floor
                                  New York, NY 10010
                                  Tel: (212) 849-7000
                                  Fax: (212) 849-8100
                                  christopherclore@quinnemanuel.com

                                  *Counsel for Defendant Yongchul "Charlie" Kim*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, a copy of the foregoing reply memorandum was electronically filed with the Clerk of the U.S. District Court for the District of Columbia via CM/ECF and served to all counsel of record via electronic mail.

 /s/ *William A. Burck*
William A. Burck (DC Bar No.: 979677)

Dated: September 16, 2024